IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

   v.            Criminal Action No. 2:09CR21

WESLEY MAYES,
   Defendant.

## ORDER/OPINION REGARDING RULE 11 HEARING

  This matter has been referred to the undersigned Magistrate Judge by the District Court for purposes of conducting proceedings pursuant to Federal Rule of Criminal Procedure 11. It shall be recalled that Defendant, Wesley Mayes, appeared in person and by counsel, Michael Sharley, on October 13, 2009. The Government appeared by Stephen Warner, its Assistant United States Attorney.

  The Court held the entire Rule 11 hearing, up through the point where Defendant actually pled guilty to the charges contained in Count One of the Indictment. Sheriff Miller testified as to the facts supporting the basic elements of the charges. When he was done testifying, Defendant stated he heard, understood, and agreed with all of Sheriff Miller's testimony. Defendant then pled **GUILTY** to the charge contained in Count One of the Indictment.

  When the Court asked Defendant to describe in his own words what he had done that convinced him he was guilty of the charge alleged in Count One of the Indictment, Defendant stated that he was at his buddy's house, and was going to go paint some gas wells with him to make some money. His next door neighbor came out and was looking for somebody, and she asked Defendant if he would go pick them up from "that area." Defendant stated he had believed the two "got thrown out of their house or something." He told the neighbor that he would pick them up. She told the two on the phone that he would pick them up and Bennett had said he would pay him ten dollars for gas. Defendant stated he drove down to the area and couldn't find them at first. He drove a little more and went down to the railroad crossing, then all the way to the Hodgesville school, and still didn't see them, but since

he had told them he would come, he turned around and went back to see if they were there. He made one more effort, and they were standing there with a black backpack.

The undersigned then asked Defendant if he knew that the two were carrying chemicals used to manufacture methamphetamine, to which Defendant replied: "No, your Honor." He then stated he didn't think about it until the sheriff stopped his car, and the sheriff knew exactly who the person in the passenger seat was, "and it started coming to me what I done." Defendant then stated that after the Sheriff walked back to the vehicle, he [Defendant] asked Bennett what was in the backpack, and Bennett said, "Nothing, nothing, I found it on the railroad tracks." Defendant then stated the deputy told him he had "got burnt" and "would spend the rest of [his] life in Federal prison."

The undersigned then asked Defendant if he was saying that he did not know, before he picked up Bennett and Foster, what they had, and that he would be helping them deliver chemicals used to manufacture methamphetamine, to which Defendant replied: "No I did not, your Honor. I did not." He also stated he smelled no chemical odor and did not know there were chemicals in the backpack.

Upon further questioning, Defendant stated that he had undergone drug treatment after a positive test for marijuana, but not for methamphetamine. He admitted he had tried methamphetamine "a couple times," but said he had never manufactured it. He was once again warned that he was under oath, and once again stated he did not know the backpack contained chemicals. It "just looked like a bookbag with clothes." He never told the police he knew there were chemicals in the backpack.

The undersigned inquired of Defendant's counsel, Mr. Sharley, why Defendant's guilty plea should be accepted under the circumstances. Counsel stated that Bennett "had a slightly different story" and would say that Defendant knew why he had come there. The chemicals were also found in Defendant's car, and Bennett says Defendant knew they were there. The risk of trial was just too great.

AUSA Warner then advised he had not debriefed Bennett as yet, but that Bennett had indicated he would testify that Defendant had knowledge of the chemicals. He advised that Defendant had not made any statements at any time indicative that he had such knowledge.

Sheriff Miller then retook the stand, and testified that Defendant's statement to police was that he was asked to go pick up Bennett and Foster, got directions, met them, and a half mile later, was stopped. He had also stated that the backpack was not his, and that Foster had brought it and "threw it in the car."

Upon consideration of all which, the undersigned United States Magistrate Judge found at the time of the first hearing, that he could not conclude the offense charged in Count One of the Indictment is supported by an independent basis in fact concerning each of the essential elements of such offense, in that there was no evidence provided regarding knowledge or wilfulness, and Defendant expressly testified under oath that he had no knowledge there were chemicals used to manufacture methamphetamine in the backpack. Sheriff Miller's testimony did, however, provide all the other essential elements of Count One.

The undersigned Magistrate Judge also did find, however, that Defendant was fully competent and capable of entering an informed plea; Defendant was aware of and understood his right to have an Article III Judge hear and accept his plea and elected to voluntarily consent to the undersigned United States Magistrate Judge hearing and accepting his plea; Defendant understood the charges against him, not only as to the Indictment as a whole, but in particular as to Count One of the Indictment; Defendant understood the consequences of his plea of guilty; and Defendant made a knowing and voluntary plea of guilty to Count One of the Indictment.

In consideration of which, the undersigned Magistrate Judge reserved acceptance of Defendant's plea of guilty to the felony charge contained Count One of the Indictment, and left the

record open in order for the United States to provide a basis for the knowledge element of the offense. The undersigned did not direct that a pre-sentence investigation report be prepared. Finally, the undersigned found that consideration of this matter tolled the Speedy Trial Act until such time as the matter is resolved. Further, consideration of Defendant's Motion to Suppress was also stayed pending further proceedings in this matter, and also tolls the Speedy Trial Act.

On October 21, 2009, the United States filed a "Motion to Supplement the Change of Plea Hearing Record" [Docket Entry 45]. The Court **GRANTS** the United States' Motion and scheduled a hearing for October 28, 2009, at 11:00 a.m. At such date and time, Defendant, in person and represented by Mr. Sharley, appeared as well as AUSA Stephen Warner. The Court reconvened the Rule 11 hearing.

The Court first determined that Defendant was still intending to enter a plea of Guilty to Count One of the Indictment. The Court then heard the testimony of three government witnesses, to wit: Toby Bennett, Marshall Powers, and Laurie Ann Walker.

Mr. Bennett testified that he is currently in jail on conspiracy to manufacture methamphetamine charges. He pled guilty to meth charges in federal court. He is a co-defendant with Defendant, and, according to his own plea, conspired with Defendant. Mr. Bennett testified that on or about July 23, 2009, he was stopped by the Sheriff at the Teter Mine area. He was there to steal anhydrous ammonia to make methamphetamine. He did not live in that area. He decided to steal the ammonia there while he was at a friend's house. He met Defendant, and both left from the friend's house. Defendant was driving and was taking Bennett and his ex-girlfriend, Amanda Foster, to steal anhydrous ammonia. Mr. Bennett testified that Defendant knew where the anhydrous ammonia tank was, while Bennett did not. He testified the two had an understanding that Defendant would take him to steal anhydrous ammonia. Defendant dropped Bennett and Foster at the site to steal the gas. They stole the gas and

then came back. Bennett testified that Defendant was "a little upset" that someone may have been watching them, so they met him somewhere else.

Bennett testified that he couldn't say that Defendant would have been involved in manufacturing the meth with him, but he did know that Defendant "knew what we were doing." He testified that it was not the first time. Bennett had sold Defendant anhydrous ammonia a month or two earlier, but Defendant never paid him and they had had an altercation. Defendant "bought" the anhydrous ammonia to make meth.

The AUSA appearing disclosed that Bennett is cooperating with his office pursuant to his plea agreement.

Marshall Powers testified he is employed by the Upshur County Sheriff's Department. He ran into Defendant in Buckhannon, while he was investigating anhydrous ammonia thefts. He received a call on July 11, 2009, that there was a vehicle parked near the railroad track in the Teter area. Two suspects with backpacks were walking toward the anhydrous ammonia tanks. Deputy Powers went to the area and observed the vehicle where the caller said it would be. He went to the back side, then toward the tanks. He could smell the chemical because the line had been cut. He also observed a 20 pound propane cylinder in the brush and two pipe wrenches, but no people.

Deputy Powers had recorded the license plate number from the vehicle. A city officer located the same vehicle at an apartment. Deputy Powers went to the apartment and spoke to the apartment manager. He also talked to Defendant, who said he had given a male a ride, parked his vehicle, and they both walked down the tracks. Defendant said, however, that he had never left the tracks. Deputy Powers received the apartment manager's consent to search, and found wet, muddy jeans, containing Defendant's identification. Defendant had no explanation for why his jeans were wet and muddy if he'd never left the railroad tracks. One has to cross a creek to get to the anhydrous ammonia tanks. Defendant denied stealing or trying to steal the gas.

5

Upon cross examination, Deputy Powers testified that he found no gas or other materials used to manufacture methamphetamine on Defendant or in the apartment.

Government witness Laurie Walker testified she used to be a meth user, and knew Defendant. She heard Defendant was a meth user who purchased pseudoephedrine to manufacture meth. She went to Clarksburg with him on two occasions about 6-8 months earlier. Defendant planned to go to Clarksburg and pick up homeless people to purchase sudafed for him. He asked Walker to take him to Clarksburg, and Walker drove. They did not find any homeless people to take to pick up pseudoephedrine, and Walker got scared and left. They were never successful, and Walker never got any meth from Defendant. Walker testified she was never asked by the police for information, but instead she contacted them and voluntarily talked with them. She also testified she had lied to the Grand Jury under oath regarding her own use of methamphetamine, but had gone to the sheriff on her own, because she needed to come clean and help herself. She came "out of the blue."

The Court then had Defendant sworn. The Court then inquired of Defendant, who stated he heard, understood, and agreed with the testimony of the witnesses concerning his actions.

The Court then inquired of Defendant, and Defendant stated he recalled the last hearing, during which he was asked numerous questions. He recalled that the Court did not accept his guilty plea at the last hearing, and that the hearing was suspended, to permit testimony to be received later, should the government wish to do so. The Court then inquired, and determined that Defendant was competent to enter a plea this date. Defendant also stated that nothing had changed regarding his understanding of the written plea agreement since the last hearing.

The Court inquired of the AUSA attending, whether the government had any intention to take any provision of the written plea agreement "off the table" as a result of anything that had occurred between the last hearing and today. The AUSA stated that there were no changes, with the exception of the possibility of investigation of possible witness intimidation.

6

The Court then inquired of Defendant, and Defendant stated he understood what Mr. Warner had just stated. The Court advised Defendant that if he was found to have some involvement, directly or indirectly with witness intimidation, that could adversely impact his agreement with the U.S. Attorney's office and with the non-binding recommendations contained therein. Further, based on his testimony at the last hearing, the Court could consider that untruthful if it so found. Either way, it could affect his sentence. Defendant stated he understood.

The Court then asked Defendant if he wished to withdraw his guilty plea, and Defendant responded that he did not. He stated he still wanted to give up his trial rights as explained to him during the last hearing, and still wanted to plead guilty. He understood he still faced the same maximum penalties explained to him at the last hearing, including period of imprisonment of not more than ten years, a fine of not more than $250,000.00 or both fine and imprisonment and a term of supervised release of not more than three years. He also understood he would be required to pay a mandatory $100.00 assessment.

The Court then reviewed with Defendant paragraph 6 of the written agreement, which provides that the United States retains the right to prosecute defendant for perjury or for making a false statement to a federal agent, and does not prevent Defendant from being prosecuted for any violation of federal or state law, should evidence of any such be obtained fro an independent source, separate and apart from information provided by Defendant pursuant to the agreement.

The Court then inquired and determined Defendant understood the sentencing Judge may consider the events of the earlier hearing and today, and make it own independent determination as to whether Defendant lied to the Court; what if any impact that would have on his sentence; and whether or not to accept any non-binding recommendation made by the United States Attorney at sentencing.

Defendant then stated he still desired to enter a plea of guilty. Defendant's counsel stated he believed Defendant was competent to enter a plea of guilty.

Thereupon, Defendant, Wesley Mayes, with the consent of his counsel, Michael Sharley, again proceeded to enter a verbal plea of **GUILTY** to the felony charge contained in Count One of the Indictment. On questioning by the Court, Defendant admitted he was driving Bennett and Foster to the Teter area knowing the purpose of that trip was to steal anhydrous ammonia. He also admitted he knew drugs were in the car at the time he was driving the car.

From the evidence, the undersigned Magistrate Judge concludes the offense charged in Count One of the Indictment is supported by an independent basis in fact concerning each of the essential elements of each offense.

Upon consideration of all of the above, the undersigned Magistrate Judge finds that Defendant is fully competent and capable of entering an informed plea; Defendant is aware of and understands his right to have an Article III Judge hear and accept his plea and elected to voluntarily consent to the undersigned United States Magistrate Judge hearing and accepting his plea; Defendant understands the charges against him; Defendant understands the consequences of his plea of guilty; Defendant made a knowing and voluntary plea of guilty to Count One of the Indictment; and Defendant's plea is independently supported by the evidence provided to the Court in its totality, including the testimony of Bennett, Powers, and Walker, combined with that of Sheriff Miller during the last hearing, which provides, beyond a reasonable doubt, proof of each of the essential elements of each charge to which Defendant has pled guilty.

The undersigned Magistrate Judge therefore **ACCEPTS** Defendant's plea of guilty to Count One of the Indictment and recommends he be adjudged Guilty of said charge as contained in Count One of the Indictment and have sentence imposed accordingly.

The undersigned further directs that a pre-sentence investigation report be prepared by the adult probation officer assigned to this case.

The Court inquired as to release or detention pending sentencing. AUSA Warner advised that he was concerned about the possibility of the witness intimidation, but since he was still investigating that, he would stick to his earlier agreement and not oppose release. The Probation Officer advised that there had been no positive drug screens since Defendant was first arrested, and there had been no other negative issues. The government not seeking detention and the probation officer stating that Defendant had complied with his conditions of release, and there being no firm evidence of witness intimidation, the Court will continue Defendant on pretrial release, with the admonishment that if any evidence of witness intimidation is found, that release could be revoked. Defendant is therefore continued on release pursuant to the Order Setting Conditions of Release previously entered in this matter pending further proceedings.

The Court further **ORDERS** that Defendant's "Motion to Suppress Evidence Due to an Illegal Stop" be **DENIED** as Mooted by Defendant's Guilty Plea.

The Clerk of the Court is directed to send a copy of this Order to counsel of record.

DATED: October 28, 2009.

*John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE